IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| Jason Maki, | Case No. 8:23-cv-264 |
| Plaintiff, | |
| v. | **COMPLAINT**<br>**JURY TRIAL DEMANDED** |
| Union Pacific Railroad Co., | |
| Defendant. | |

Plaintiff Jason Maki ("Maki") files this Complaint against Defendant Union Pacific Railroad Co. ("Union Pacific" or "Defendant") for damages resulting from its violation of the Americans with Disabilities Act, 42 U.S.C § 12101 *et seq.*, as amended ("ADA").

### PRELIMINARY STATEMENT

1. Beginning in 2014, Union Pacific implemented company-wide changes to its fitness-for-duty program ("Fitness-for-Duty"). As a result of these changes, Union Pacific imposed a blanket requirement that employees in certain positions disclose specified health conditions—even when the condition had no impact on the employee's ability to safely perform his or her job. This requirement was needlessly invasive and violated the ADA by itself, but Union Pacific made matters worse by imposing a policy that automatically removes employees who disclose health conditions, or who Union Pacific suspects may have health conditions, from service. Union Pacific then subjects the employee to a Fitness-for-Duty evaluation, again regardless of whether the employee has been safely performing the essential functions of his or her job. These evaluations do not assess whether an employee is capable of performing the essential functions of his or her position, and Union Pacific does not conduct physical examinations of employees.

Furthermore, Union Pacific routinely disregards the opinions of outside doctors who do conduct physical evaluations of the employees. Instead, Union Pacific demands medical information from the employee and conducts a "file review," regularly and arbitrarily concluding that the employee is unfit for duty because of a disability, and issuing unnecessary work restrictions it then refuses to accommodate.

2. In February 2016, several Union Pacific employees commenced a class-action disability discrimination lawsuit against Union Pacific, alleging that Union Pacific's Fitness-for-Duty policies and practices constituted a pattern or practice of discrimination under the ADA. *See Quinton Harris et al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.). The District of Nebraska certified the class in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision in March 2020.

3. Maki is a victim of the same discriminatory Fitness-for-Duty policies and practices alleged in *Harris*. Despite being qualified for and safely performing his job without incident, Maki was removed from service for a Fitness-for-Duty evaluation under the new program and excluded from work at Union Pacific because of a disability. Maki was a class member in *Harris*, and now timely brings this individual legal action.

## JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. § 1331 because Union Pacific violated the ADA.

5. Venue is proper under 28 U.S.C. § 1391(b)(1), because defendant is headquartered in Omaha, Nebraska.

6. Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because unlawful employment practices were committed by Union Pacific in Omaha, Nebraska, because employment records relevant to defendant's unlawful employment practices are maintained and administered in Omaha, Nebraska, and because Union Pacific's principal office is in Omaha, Nebraska.

## THE PARTIES

7. Maki resides in Superior, Wisconsin. He was an employee of Union Pacific working in Wisconsin Rapids, Wisconsin.

8. Union Pacific is a railroad carrier engaged in interstate commerce and has operations in Wisconsin Rapids, Wisconsin and is headquartered in Omaha, Nebraska.

## FACTUAL ALLEGATIONS

### *UNION PACIFIC'S FITNESS-FOR-DUTY POLICIES AND PRACTICES*

9. Union Pacific's Medical Rules, as reviewed and revised on February 1, 2014 (attached as Exhibit A), apply to all Union Pacific employees across the country. They outline the Fitness-for-Duty program at Union Pacific.

10. The Medical Rules require, among other things, that all employees in Telecom positions, Supply Department field positions, Operating Department field positions (including Transportation, Engineering Services and Mechanical positions), and Dispatcher positions disclose "any new diagnosis, recent events, and/or change in the following conditions"—which Union Pacific labels as "Reportable Health Events" (Exhibit A). This includes, but is not limited to, a seizure of any kind.

11. Union Pacific's Fitness-for-Duty and "Reportable Health Events" policies are even broader in practice than the Medical Rules reflect. Union Pacific routinely triggers

the Fitness-for-Duty process for employees who have never indicated they are unable to perform the essential functions of their jobs, simply because Union Pacific learns or suspects that the employee has, or has had in the past, a listed or non-listed health condition, or because a manager refers the employee to Health and Medical Services based on a belief that an employee may have such a health condition.

12. Union Pacific also maintains other unlawful policies and qualification standards related to Fitness-for Duty that are not included within the Medical Rules. For example, Union Pacific uses a "1% rule" that disqualifies from service any employee who Union Pacific suspects or believes may be at more than a 1% risk of sudden incapacitation. Union Pacific also requires employees to undergo exercise tolerance testing and then disqualifies from service any employee whose test results are not "normal," based on an indication that the employee may have a cardiac condition, however minor. On information and belief, Union Pacific maintains other, similar policies that it uses to screen out employees with disabilities for failing to meet a discriminatory qualification standard.

13. When a Fitness-For-Duty evaluation is triggered, the employee must:

**Stay off work** (not to report to work or mark up for work) until Health and Medical Services has completed a Fitness-for-Duty evaluation for that particular health event and has provided the employee's Supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty determination prior to the employee being able to work.

**Notify Health and Medical Services** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation.

(Exhibit A.)

14. These Fitness-for-Duty evaluations are not individualized assessments of

4

the employee's ability to safely perform the essential functions of the employee's job.

15. Union Pacific does not directly examine employees during Fitness-For-Duty evaluations.

16. Union Pacific routinely disregards the opinions of the employee's treating medical provider(s), and other medical providers who have physically examined the employee, and instead makes broad requests for medical information, including medical records, from the employee.

17. Once Union Pacific receives the medical information, Union Pacific's Health and Medical Services Department, located in Omaha, Nebraska, conducts a "file review" and issues a Fitness-for-Duty determination that the employee is either fit for duty, fit for duty with restrictions, or unfit for duty.

18. Union Pacific's Health and Medical Services Department routinely issues Fitness-for-Duty determinations that disqualify employees from their positions because of a disability, even though the disability does not affect the employee's ability to safely perform the essential functions of the employee's job (or other positions for which the employee may also be qualified).

19. The Health and Medical Services Department also uses discriminatory qualification standards, tests, and/or other criteria to exclude individuals with disabilities from their positions.

20. When issuing Fitness-for-Duty determinations, the Health and Medical Services department relies on standardized protocols for employees with certain broad categories of health conditions or treatments, and assigns standardized work restrictions to employees.

21. For example, as part of these standardized protocols, the Health and Medical Services Department regularly relied on the Federal Motor Carrier Safety Administration ("FMCSA") 2014 Medical Examiner's Handbook ("2014 Medical Examiner's Handbook"), which the company downloaded from the FMCSA website, to determine which health conditions required work restrictions, which standard restrictions to impose, and how long those restrictions should remain in place.

22. Union Pacific's then-Chief Medical Officer Doctor John Holland described the 2014 Medical Examiner's Handbook as "one of the sources we think is the best."

23. The recommendations contained in the 2014 Medical Examiner's Handbook, however, did not apply to railroad workers, but instead provided non-binding guidance to FMCSA medical examiners intended for use in medical certification of drivers operating a commercial vehicle in interstate commerce.

24. In addition, by December 2014, the FMCSA withdrew the 2014 Medical Examiner's Handbook from its website and no longer endorsed it for use for commercial driver certifications. Upon information and belief, the FMCSA never again endorsed the 2014 Medical Examiner's Handbook once it was removed from the website.

25. By at least 2015, Dr. Holland and Union Pacific learned that the FMCSA removed the Handbook from its website and no longer endorsed its use.

26. Despite this, Union Pacific continued to rely on the outdated Handbook as a basis to assign standardized work restrictions for its employees, including workers who are not subject to FMCSA medical certification requirements.

27. Union Pacific also represented to Courts, including in the *Harris* action, that the 2014 Medical Examiner Handbook was reliable guidance and supported its decisions

to impose standardized work restrictions for its employees. For example:

    a. "Union Pacific concluded that the 1% level of acceptable risk for sudden incapacitation is consistent with the acceptable risk threshold recommended by the FMCSA Medical Review Board and the 2014 version of the online FMCSA Medical Examiner Handbook[.]" Def.'s Br. in Opp'n to Pl.'s Mot. for Class Certification at 21, *Harris et al. v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 259 (internal quotations omitted).

    b. "In 2014 the FMCSA issued Medical Examiner Handbook (FMCSA 2014) to provide medical examiners guidance for making medical fitness-for-duty recommendations for multiple health conditions that can impair the safety for commercial vehicle drivers. These and other recent FMCSA guidance documents, have served [] as reference materials and a general model for developing the Medical Fitness-for-duty Guidelines presented here." Dr. Holland Rebuttal Expert Report, May 11, 2018, *Harris et al. v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 249-16.

    c. "Since 2014, Union Pacific has relied on the FMCSA's guidelines, as reflected in its Medical Examiner Handbook, in determining whether employees with epilepsy, a single unprovoked seizure, or other seizure risks who work in safety sensitive positions have an unacceptably high seizure risk such that it is appropriate to impose work restrictions." Decl. of Dr. John Holland dated Oct. 2, 2018, at 6, *Harris et al. v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 261-71.

28. Through its Fitness-For-Duty program, Union Pacific removes employees from service based on medical conditions it learns or believes an employee may have or may have had in the past, whether or not such conditions actually interfere with the employee's ability to perform the essential functions of their position, and without making a good-faith effort to determine whether a reasonable accommodation exists.

29. As a result of the conduct described above, Union Pacific employees who have never had a problem performing the essential functions of their jobs have been forced to disclose sensitive medical information, stay off work without pay, and many have lost their livelihoods.

### *PLAINTIFF JASON MAKI*

30. Maki was hired by Union Pacific on January 10, 2011, as a conductor trainee.

31. Most recently, Maki worked for Union Pacific as a conductor in Wisconsin Rapids, Wisconsin. Over his 6-year career with Union Pacific, he worked ably in and around trains.

32. On or about September 18, 2017, Maki had a seizure while at work, sitting at a desk waiting for the outbound crew to relieve him. He had been awake for approximately 24 hours at the time and did not typically stay awake that long.

33. Because Maki had a seizure, Union Pacific immediately removed him from work without pay. While being held out of work, Maki sought treatment from medical specialists regarding his seizure. Union Pacific requested certain medical records, and Maki promptly complied with this request.

34. On October 12, 2017, Maki's neurologist, Dr. Douglas W. Kaplan, cleared Maki to return to work with no restrictions, subject to a normal MRI of his brain. Dr. Kaplan stated that while "[t]he exact cause for his seizure is unclear[,] [c]ertainly his 24 hours of sleep deprivation could have been a triggering factor." Maki obtained an MRI of his brain, and the results were within normal limits.

35. Maki's treating physician, Dr. Denver Ulland, also cleared Maki to return to work full duty on October 31, 2017.

36. Despite these clearances from his treating physicians, Union Pacific placed onerous work restrictions on Maki for a minimum of five years. Union Pacific told Maki that he could attempt to return to work after he was seizure-free for five years and not

taking any anti-seizure medications.

37. At no time during Union Pacific's Fitness-for-Duty evaluation process, or after, did any doctor affiliated with Union Pacific physically examine Maki.

38. Upon information and belief, at no time during or after this process did Dr. Holland or any doctor affiliated with Union Pacific speak with any of Maki's treating doctors, including those who had cleared him to return to work.

39. Upon information and belief, in imposing unnecessary and unwarranted restrictions on Maki, Union Pacific relied on guidance from the outdated FMCSA Medical Examiner Handbook and the "1% rule."

40. In the time since Maki's removal from service and work restrictions, Union Pacific has persisted in its refusal to allow him to return to his job.

41. Since Union Pacific has held him out of service, Maki worked at Menards, Inc., earning substantially less than he did at Union Pacific. He also enrolled in school to learn a new trade and now works as an electrician apprentice.

42. Maki remains capable of working in his former position for Union Pacific to this day.

43. On February 19, 2016, counsel for Maki, on behalf of six named plaintiffs and those similarly situated, filed a First Amended Complaint against Union Pacific in the Western District of Washington, alleging disability discrimination in violation of the ADA, along with state law. The case was thereafter transferred to the District of Nebraska. *See Harris et al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.).

44. Because he was a class member in the *Harris* case, Maki's disability discrimination claims have been subject to tolling during the pendency of litigating the

class-wide claims, pursuant to the Supreme Court's ruling in *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983).

45. This Court certified the class action in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision on March 24, 2020.

46. As a result of *Crown Cork* tolling, Maki had three hundred (300) days from the date of the Eighth Circuit's order to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Shortly after the Eighth Circuit issued its order reversing class certification, the parties entered into a tolling agreement, extending the statute of limitations for Maki's and other class members' claims by an additional sixty (60) days. Maki timely filed a charge of discrimination with the EEOC on April 17, 2020. On June 14, 2023, the EEOC issued a right-to-sue letter. Maki now timely initiates the present lawsuit.

## CAUSES OF ACTION

### COUNT I
### *VIOLATIONS OF THE ADA, 42 U.S.C. § 12112(a)*
### *DISABILITY DISCRIMINATION—DISPARATE TREATMENT*

47. Maki incorporates the foregoing paragraphs by reference.

48. The ADA defines a disability as (A) a physical or mental impairment that impairs one or more major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1).

49. At all relevant times, Maki was an individual with a disability as defined by the ADA.

50. At all relevant times, Maki had the requisite skill, experience, education, and other job-related requirements of his position, could perform the essential functions of

10

his position with or without reasonable accommodations, and was therefore a qualified individual under the ADA.

51. Section 12112(a) of the ADA prohibits employers from discriminating against qualified individuals on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

52. Union Pacific discriminated against Maki on the basis of disability by, among other things, removing him from service because of a disability.

53. Because Union Pacific violated 42 U.S.C. § 12112, Maki has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Maki is also entitled to attorneys' fees and costs incurred in connection with these claims.

54. Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Maki and others similarly situated. As a result, Maki is entitled to punitive damages.

### COUNT II
*VIOLATIONS OF THE ADA, 42 U.S.C. § 12112(b)(6)*
*DISABILITY DISCRIMINATION—DISPARATE TREATMENT*

55. Maki incorporates the foregoing paragraphs by reference.

56. " '[D]iscriminat[ing] against a qualified individual on the basis of disability' includes…using qualification standards, employment tests or other selection criteria that screen out . . . an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity[.]" 42

U.S.C. § 12112(b)(6).

57. Union Pacific discriminated against Maki on the basis of disability by using facially discriminatory qualification standards, employment tests, and/or other selection criteria, as part of its Fitness-For-Duty program and related policies, that are intended to screen out individuals with disabilities, and which did screen out Maki.

58. Union Pacific's qualification standards are neither job-related nor consistent with business necessity.

59. Because Union Pacific violated 42 U.S.C. § 12112, Maki has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Maki is also entitled to attorneys' fees and costs incurred in connection with these claims.

60. Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Maki and others similarly situated. As a result, Maki is entitled to punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE, Plaintiff Jason Maki prays for judgment against Union Pacific as follows:**

1. That the practices of Union Pacific complained of herein be determined and adjudged to constitute violations of the ADA;
2. An injunction against Union Pacific and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

3. For an award of damages arising from loss of past and future income, emotional distress, and other compensatory damages in excess of $75,000.00;

4. Pre-judgment interest, as provided by law;

5. For Maki's costs, disbursements and attorneys' fees pursuant to law;

6. For an award of punitive damages;

7. For all relief available under the ADA;

8. For such other and further relief available by statute; and

9. For such other and further relief as the Court deems just and equitable.

Date: June 15, 2023　　　　　　　　　　**NICHOLS KASTER, PLLP**

s/*Caitlin L. Opperman*
James H. Kaster* (MN # 53946)
　　kaster@nka.com
Lucas J. Kaster* (MN # 396251)
　　lkaster@nka.com
Caitlin L. Opperman* (MN# 0399978)
　　copperman@nka.com
80 South Eighth Street
4700 IDS Center
Minneapolis, Minnesota 55402-2242
Telephone: (612) 256-3200
Fax: (612) 338-4878

*Admitted in D. Neb*

**ATTORNEYS FOR PLAINTIFF**